UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| **MELISSA ANN HOLSTE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | **Case No. 04-CV-2183** |
| ) | |
| **SLB OF CENTRAL ILLINOIS, L.L.C.,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION

This case is before the court for ruling on Defendant's Motion for Summary Judgment (#16) and Plaintiff's Motion to Strike Defendant's Reply (#21). Following this court's careful consideration of the arguments of the parties and the documents provided by the parties, Plaintiff's Motion to Strike (#21) is DENIED and Defendant's Motion for Summary Judgment (#16) is GRANTED. Accordingly, the Motions in Limine (#26, #27) filed by the parties are MOOT.

## FACTS[1]

Plaintiff, Melissa Ann Holste, was hired by the St. Louis Bread Company in January 1996. She was employed as a shift supervisor at the Panera Bread café on John Street in Champaign (Campus café). Defendant, SLB of Central Illinois, L.L.C., began operating the Campus café under a franchise agreement in July 1997. In January 1998, Richard Pope was promoted from assistant manager to general manager of the Campus café and Plaintiff was promoted to assistant manager. Pope testified that Plaintiff was a reliable and dependable employee in many ways but that her weakness was "[v]olatility."

Christopher Wolfe is majority owner of Defendant and has held various positions in the

---

[1] The statement of facts in this case is based upon Defendant's Statement of Undisputed Facts, Plaintiff's Response and Statement of Additional Material Facts, Defendant's Reply, and the documents submitted by the parties.

company from general manager to operating partner. After Defendant began operating the Campus café, Defendant subsequently opened several other Panera Bread cafés in central Illinois. Wolfe testified that he was focused on opening the new cafés and was at the Campus café infrequently during that time. Wolfe testified that, at the beginning of 2002, he turned his attention to the Campus café, and it is undisputed that his expectations for the Campus café went up at that time. Tracie Baker-Smith was Defendant's Regional Training Manager. Baker-Smith testified that she worked with all of Defendant's cafés and "was ensuring that operations were running smoothly." In the spring of 2002, Baker-Smith had increased conversations with Wolfe about the problems at the Campus café. In May 2002, Baker-Smith told Wolfe that she had doubts about Pope's ability to manage the Campus café. On July 2, 2002, the corporate office of St. Louis Bread performed an unscheduled audit on the Campus café which resulted in a 48% rating for the Campus café. The corporate audit confirmed what Baker-Smith was telling Wolfe and what he was observing. Wolfe decided to remove Pope as general manager.

 Before informing Pope of his decision, Wolfe called Deb Reynolds, who was general manager of the Panera Bread café on Kirby Avenue in Champaign, and asked her if she would be interested in hiring Pope as an assistant manager. Reynolds agreed to hire Pope. Reynolds testified that she had previously worked with Pope and stated that she told Wolfe that Pope "and I worked well together and that I would like to have him over there." Wolfe met with Pope on July 9, 2002, and advised him that they needed to make a change. Wolfe testified that Pope was not "thrilled" but that the meeting was "cordial, professional, understanding." Wolfe stated that Pope "knew his shortcomings as a general manager" and the meeting "ended with a handshake." Pope agreed to take the assistant manager position and was given his same rate of pay as assistant manager.

Prior to his meeting with Pope, Wolfe called Plaintiff to see if she was interested in the general manager position. Wolfe testified that he felt he owed Plaintiff a chance and that he "didn't have many options at the time." Plaintiff was positive about the opportunity and believed she could make the needed changes at the Campus café. Wolfe testified that he met with Plaintiff and "outlined my expectations for the store." He testified that he reiterated what he had been telling Pope and Plaintiff over the last year and a half about what the café needed to work on which was "[e]mployee accountability, getting just the basics done," which, in his mind, was "just cleanliness, the day-to-day operations, and the management style of the café." Because the goal was to improve the operational level of the Campus café, Wolfe told Plaintiff that she did not need to worry about labor costs at the expense of operations. Wolfe testified that he told Plaintiff "it needs to happen right away." Wolfe testified that he told Plaintiff that he wanted to have the Campus café "running as smooth as the other five" by the time two new cafés were opened in November and December. Plaintiff testified that Wolfe told her what his expectations were regarding changes at the café and said that "around the first of the year, we would sit back down and look at where the store was at then." Plaintiff also testified that she recognized that the café was having problems before she became general manager and that Wolfe definitely wanted to see a turnaround.

At the end of August 2002, Stephen Sapp became the district manager over the Campus café. Shortly after he started, Sapp and Plaintiff completed a baseline calibration of the Campus café to see where the café was. A calibration is one of the tools used to evaluate a café and consisted of having a outside person audit various aspects of the café including paperwork, cleanliness and company specifications. This calibration, which was completed September 4, 2002, showed the Campus café at 48.92% and meant that the café was unsatisfactory in all areas. Sapp testified that

3

he told Plaintiff that this calibration was not a reflection on her management, but of the previous management, and that it would serve as a starting point. Sapp told Plaintiff that another calibration would be done in November. Plaintiff understood that the September calibration would not be held against her. However, Wolfe testified that he was "furious" about this calibration because it showed that nothing had improved from July to September. Wolfe testified that he met with Plaintiff and told her that this was not acceptable. According to Plaintiff, Wolfe and Sapp told her they had confidence in her and that she was the person for the job. Wolfe testified that he told Sapp to "go in and get things done."

After that, Sapp was in the café once or twice a week and met with Plaintiff about what needed to be done. Sapp testified that Plaintiff was "very negative towards me." He testified that Plaintiff "was very, very close to the associates that worked there. More of a buddy than a boss. She didn't want anybody to get mad at her." Sapp stated that Plaintiff often got very defensive and took things personally. Baker-Smith testified that Sapp told her he was not getting cooperation from Plaintiff on accomplishing even simple tasks and sought extensive counsel from her on how to deal with Plaintiff's lack of cooperation.[2]

At the time Plaintiff began as general manager, she only had one assistant manager, Jon Engelbreit, who was relatively new to the position. On July 22, 2002, Wolfe hired Michael Wax as assistant manager at the Campus café. Wax went through a training period and started working as assistant manager on September 9, 2002. Engelbreit left his position as assistant manager on October 6, 2002, so Plaintiff was again down to one assistant manager. Wolfe hired Trevor Planck as an assistant manager on September 30, 2002. Planck completed his training period and began

---

[2] Plaintiff has objected to this and other facts as "based on hearsay." However, this court concludes that this evidence is relevant and admissible to show the basis for Defendant's actions.

working at the Campus store on November 4, 2002.

Baker-Smith testified that, after Wax began working at the Campus café, she observed Plaintiff being "very dismissive of him when he was trying to help her." Baker-Smith said that, on one occasion, Wax told Plaintiff that he had concerns about the salad bar area not being set up and utilized according to Defendant's specifications and Plaintiff "did not respond to him." Sapp also testified that Wax reported to him that things "weren't happening at the store the way that they were supposed to be happening." Sapp also stated that "when I would walk into the store, I could see that [Wax] was right."

Plaintiff testified that, on Planck's first day at the Campus café, he reported to her that the salad line was not set up to specifications or that her employees did not know their specifications and she took this "personally." Plaintiff testified that she "took that pretty personally because I really cared about what was going on in the store." Sapp testified that the next day, November 5, 2002, there was a "bread bash" scheduled at the Campus café. A bread bash is an employee meeting where new products are introduced. Sapp testified that he had given both Wax and Planck specific things he wanted them to talk about at the bread bash. Sapp testified that a typical bread bash lasts about an hour and a half and there is a script that you are supposed to go by or at least use as a guideline. Sapp testified that this was a very important bread bash because "[a]ll three new managers were there, it was a new management team, it was time to get everybody motivated and to say this is our team, this is what we're going to do." Sapp testified that he told Plaintiff how important the bread bash was and that she needed to introduce her management team to the employees and motivate them. Sapp testified that Planck reported to him that the bread bash was very short and that Plaintiff did not allow Planck to do his presentation because she told him he was

"not going to do that because we're not going to do it that way." Plaintiff testified that she did not agree with Planck's report about the bread bash and that she did not agree that it only lasted 15 to 20 minutes.

Sapp testified that, after Planck's complaint, he and Wolfe decided that Plaintiff should be terminated as general manager of the Campus café. Wolfe testified that Sapp called him and told him that "nothing's happening, nothing's changing" and that he agreed that Plaintiff should be moved out of that role. Wolfe testified that Plaintiff's unsatisfactory performance was confirmed by customer satisfaction surveys which indicated that customer satisfaction had fallen from 62% to 23% during Plaintiff's tenure at the Campus café.

Before telling Plaintiff that she was going to be removed as general manager, Wolfe spoke to Reynolds to see if she would be willing to have Plaintiff work as assistant manager at the Kirby Avenue café. Reynolds said that she did not want to take Plaintiff as an assistant manager. Reynolds testified that she had previously supervised Plaintiff and that she and Plaintiff did not get along very well. Reynolds testified that Plaintiff was "emotional at times, and she would get upset and we wouldn't talk for days." Reynolds testified that she "just didn't see her as being a good fit."

Wolfe and Sapp met with Plaintiff on November 6, 2002, to let her know she was being terminated as the general manager of the Campus store. According to Sapp, Plaintiff immediately became upset and said "Fuck it. I quit," and threw down her keys. Wolfe testified that Plaintiff said, "I can't believe this. Fuck you. Fuck this. I quit" and threw her keys. Wolfe told Plaintiff to calm down so they could discuss it. Plaintiff said she wanted to wait until the next calibration, but Wolfe told her that it was not necessary to do a calibration to see that things were not improving. At her

deposition, Plaintiff testified that it was true that "performance can be evaluated without a calibration." According to Plaintiff, Wolfe told her that they would transfer her but they knew she would not take another position. Plaintiff testified that she was in shock and said "I don't know." Wolfe testified that he told Plaintiff that there was no position for her in town but he could talk to other cafés and see. Wolfe testified that Plaintiff said, "No, I don't want that." Wolfe testified that, prior to the meeting, it was his intention to look into whether there were openings at other cafés and have Plaintiff interview with some of the general managers. Wolfe and Sapp testified that Plaintiff left the meeting telling them to "go to hell." Plaintiff admitted at her deposition that she raised her voice at the end of the meeting and told Wolfe and Sapp this was "bullshit."

Although there is some dispute regarding some aspects of the meeting, Plaintiff does not dispute that Defendant terminated her as general manager for unsatisfactory performance. At the time of Plaintiff's termination, five of the six cafés owned by Defendant had a female general manager. Following Plaintiff's termination, Sapp temporarily took over as general manager of the Campus store. On December 30, 2002, Wax became the general manager.

On December 3, 2002, Plaintiff sent a letter to Wolfe which was drafted by her attorney. In the letter, Plaintiff requested a position as assistant manager. Wolfe testified that he considered this a self-serving letter and that, after Plaintiff's conduct during the termination meeting, she was not eligible for a transfer or rehire. Wolfe did not respond to Plaintiff's letter.

On April 3, 2003, Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission (EEOC). Plaintiff alleged that she was discriminated against on the basis of her sex when she was discharged on November 6, 2002, when Defendant failed to transfer her on November 6, 2002, and when Defendant failed to

7

hire her on or after December 4, 2002. On June 24, 2004, the EEOC issued a Notice of Right to Sue. Plaintiff filed her Complaint (#1) in this court on August 30, 2004, alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

On January 13, 2006, Defendant filed its Motion for Summary Judgment (#16). The motion for summary judgment is now fully briefed and ready for ruling.

## ANALYSIS

### I. MOTION TO STRIKE

On March 7, 2006, Plaintiff filed a Motion to Strike Defendant's Reply (#21) and a Memorandum of Law in Support (#22). Plaintiff argued that the Reply was untimely and that it relied on the "same-actor" inference which has been rejected by the Seventh Circuit. On March 15, 2006, Defendant filed its Response to Plaintiff's Motion to Strike (#23). Defendant noted that the Civil Administrative Procedures for Filing, Signing and Verifying Pleadings and Papers by Electronic Means preserves the three-day rule for service by mail when serving by electronic means. Defendant argued that, allowing three days for service, its Reply was timely filed. Defendant also argued that striking the entire Reply because of the same actor argument would be unfair to Defendant.

This court agrees with Defendant's arguments. Defendant's Reply was timely filed and there is no basis for striking the Reply based on one argument made in the Reply. This court notes that Motions to Strike are disfavored. See Sun v. Bd. of Trs. of Univ. of Ill., ___ F. Supp. 2d ___, 2006 WL 1149545, at *23 (C.D. Ill. 2006). Generally, it is not this court's practice to grant motions to strike when ruling on motions for summary judgment. See Sun, 2006 WL 1149545, at *23. This court further notes that it is very well able to only consider arguments which are supported by the

8

applicable case law in the Seventh Circuit. Accordingly, Plaintiff's Motion to Strike Defendant's Reply (#21) is DENIED.

## II.  MOTION FOR SUMMARY JUDGMENT

### A.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000), quoting Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999). In making this determination, the court must consider the evidence in the light most favorable to the party opposing summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970); Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 938 (7th Cir. 2003). However, neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment. Michas, 209 F.3d at 692. Moreover, a plaintiff cannot defeat summary judgment by raising immaterial issues of fact. See Jordan v. Summers, 205 F.3d 337, 345 (7th Cir. 2000).

B.  PLAINTIFF'S CLAIMS

Under Title VII, it is unlawful for an employer "to fail to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 978 (7th Cir. 2004), quoting 42 U.S.C. § 2000e-2(a)(1).  Thus, in a case involving alleged discrimination on the basis of sex, "there are two primary issues to consider: first, was the purported difference in treatment prompted by plaintiff's sex, and second, did the difference in treatment affect plaintiff's compensation, terms, conditions, or privileges of employment." Wyninger, 361 F.3d at 978, quoting Haugerud v. Amery Sch. Dist., 259 F.3d 678, 691 (7th Cir. 2001).

An employee alleging sex discrimination can either proceed directly, by presenting direct and/or circumstantial evidence on the issue of discriminatory intent or can proceed indirectly, by utilizing the burden-shifting method set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Wyninger, 361 F.3d at 978.  Plaintiff has argued that there is sufficient circumstantial evidence of discrimination in this case to proceed under the direct method.  However, based upon the facts of this case, this court concludes that, on each of her sex discrimination claims, Plaintiff has failed to establish a genuine issue of material fact using the direct method.  Plaintiff has presented no direct evidence and very little circumstantial evidence to support her contention that Defendant discriminated against her because of her gender.  See Wyninger, 361 F.3d at 978. Therefore, Plaintiff must proceed under the indirect McDonnell Douglas method.  See Wyninger, 361 F.3d at 978.

In order to establish a prima facie case of sex discrimination under the indirect method,

Plaintiff must show: (1) she is a member of a protected class; (2) at the time of her termination, she was meeting her employer's legitimate employment expectations; (3) in spite of meeting the legitimate employment expectations of her employer, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male employees. Peele v. Country Mut. Ins. Co., 288 F.3d 319, 326 (7th Cir. 2002); see also Goodwin v. Bd. of Trs. of Univ. of Ill., 442 F.3d 611, 617 (7th Cir. 2006). In determining whether an employee is meeting the employer's legitimate employment expectations, the issue is not the employee's past performance but rather whether the employee was performing well at the time of her termination. Peele, 288 F.3d at 329.

Once the plaintiff establishes a prima facie case of discrimination, the employer, to avoid liability, must produce a legitimate, nondiscriminatory reason for its action. See Peele, 288 F.3d at 326. If the employer offers a legitimate, nondiscriminatory reason for its actions, the plaintiff must then rebut that explanation by presenting evidence sufficient to enable a trier of fact to find that the employer's proffered explanation is pretextual. See Peele, 288 F.3d at 326. However, a plaintiff does not reach the pretext stage "unless she first establishes a prima facie case of discrimination." Peele, 288 F.3d at 326. "If a plaintiff is unable to establish a prima facie case of employment discrimination under McDonnell Douglas, an employer may not be subjected to a pretext inquiry." Peele, 288 F.3d at 327.

In this case, it is undisputed that Plaintiff is a member of a protected class and suffered an adverse employment action. However, this court concludes that Plaintiff cannot establish a prima facie case of discrimination because she cannot show that she was meeting her employer's legitimate employment expectations.

In fact, Plaintiff has stated in her Memorandum of Law in Opposition to Defendant's Motion

11

for Summary Judgment that "it may be assumed that [Plaintiff] was unsuccessful in meeting [Defendant's] expectations for the Campus store in her brief tenure as general manager." Plaintiff argued, however, that this fact does not doom her prima facie case. Plaintiff argued that she has produced evidence sufficient to raise an inference that the employer applied its legitimate employment expectations in a disparate manner. According to Plaintiff, this then means that the second and fourth prongs of the prima facie case merge, thus allowing her to establish a prima facie case and proceed to the pretext inquiry. Plaintiff relies on Peele, Curry v. Menard, Inc., 270 F.3d 473 (7th Cir. 2001) and Flores v. Preferred Technical Group, 182 F.3d 512 (7th Cir. 1999). Plaintiff argues that Pope and Plaintiff were similarly situated and that Pope was treated more favorably because he was given a longer time as general manager, and more help, before he was terminated and because he was transferred to a different position. However, based upon the case law cited by Plaintiff, this court concludes that Plaintiff has clearly failed to establish a prima facie case of discrimination.

In Peele, the plaintiff argued, as Plaintiff has here, that she could still establish a prima facie case of discrimination even if she was not meeting her employer's legitimate employment expectations. See Peele, 288 F.3d at 329. The plaintiff in Peele claimed that her employer strictly enforced standards against her, but did not do so with respect to similarly situated male and younger employees. See Peele, 288 F.3d at 330. The Seventh Circuit concluded, however, that the plaintiff was not able to show that any of the employees she claimed were "similarly situated" were actually comparable to her situation. See Peele, 288 F.3d at 330-31. This court concludes that the same is true in this case.

"To show that another employee is 'similarly situated,' a plaintiff must show that there is

someone who is comparable to her in all material respects." Durkin v. City of Chicago, 341 F.3d 606, 613 (7th Cir. 2003), quoting Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). Courts must consider all relevant factors to determine whether two employees are similarly situated. Durkin, 341 F.3d at 613, citing Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000). In disciplinary cases, those cases in which the plaintiff claims that he or she was disciplined more harshly that another employee based upon a prohibited reason, the plaintiff must show that he or she is similarly situated with respect to performance, qualifications and conduct. Ezell v. Potter, 400 F.3d 1041, 1049 (7th Cir. 2005); Peele, 288 F.3d at 330. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Ezell, 400 F.3d at 1049-50, quoting Peele, 288 F.3d at 330.

In this case, it is undisputed that Wolfe's expectations for the Campus café went up in early 2002. Because Pope was not able to meet those expectations, he was terminated as general manager shortly thereafter, in July 2002. Plaintiff was then given the opportunity to improve the Campus café as general manager. The facts show that Plaintiff was well aware that Wolfe expected improvement and wanted it to happen soon. Instead, Plaintiff was uncooperative with Sapp's attempts to help her improve the Campus café, did not respond to Wax's attempts to point out areas that need to be improved and took "personally" Planck's comments about problems he saw. Sapp and Wolfe concluded that nothing had changed between July and November. Therefore, because Plaintiff was not able to meet Wolfe's expectations for the Campus café, she was terminated as general manager. Accordingly, as far as Plaintiff's termination, she and Pope were treated exactly

the same.

As far as Plaintiff's transfer and rehire claims, she cannot show that she and Pope were similarly situated. Wolfe did exactly the same thing before informing Pope and Plaintiff that they were being terminated as general manager, he contacted Reynolds about the availability of an assistant manager position. Reynolds had previously supervised both Pope and Plaintiff. She was willing to take Pope as an assistant manager at the Kirby Avenue café because they had worked well together previously. However, Reynolds was not willing to take Plaintiff because they did not work well together. Reynolds testified that Plaintiff was "emotional at times, and she would get upset and we wouldn't talk for days." Reynolds testified that she "just didn't see [Plaintiff] as being a good fit." Plaintiff has not submitted any evidence which contradicts Wolfe's testimony that he did not intend to leave it at that, but planned to have Plaintiff interview with other general managers. However, whereas the meeting with Pope was "cordial, professional, understanding" and Pope said that he was willing to take a position as assistant manager, the meeting with Plaintiff was completely different. This court recognizes that there is differing testimony regarding this meeting. However, even accepting Plaintiff's version of the meeting, Plaintiff raised her voice and swore during the meeting and did not express interest in a transfer to an assistant manager position when that topic was discussed. Because of her actions at the termination meeting, Wolfe decided that she was not eligible for transfer or rehire. Therefore, there were "differentiating" circumstances in this case that distinguished Plaintiff's conduct and the employer's treatment of her. See Peele, 288 F.3d at 330. Based upon her conduct at the termination meeting, Plaintiff cannot show that she was similarly situated to Pope. Therefore, she cannot show that a similarly situated employee was treated more favorably. See Peele, 288 F.3d at 330-31.

Plaintiff's reliance on Curry and Flores is also misplaced. In both Curry and Flores, the plaintiff presented evidence that numerous employees engaged in the same conduct but only the plaintiff was disciplined. See Curry, 270 F.3d at 478 (the plaintiff was terminated under the employer's progressive discipline policy for having three cash discrepancies and presented evidence that sixteen other individuals should have been terminated under the progressive discipline policy if the policy had been strictly enforced); Flores, 182 F.3d at 515-17 (the plaintiff was the only one terminated for participating in an unlawful work stoppage although numerous other employees also participated; however, court ultimately determined that employer had legitimate nondiscriminatory reason for firing her because employer reasonably believed she was the instigator of the work stoppage). In this case, there was absolutely no evidence that Plaintiff was "singled out for discipline" as the plaintiff was in Curry and Flores. See Peters v. Renaissance Hotel Operating Co., 307 F.3d 535, 546 (7th Cir. 2002).

In this case, the record clearly demonstrates that Plaintiff's job performance was unsatisfactory. See Peele, 288 F.3d at 331. Further, Plaintiff has not shown that Defendant enforced its legitimate employment expectations in a disparate manner. See Peele, 288 F.3d at 331. Therefore, this court is unable to infer discriminatory intent under the McDonnell Douglas framework and Plaintiff has therefore failed to establish a prima facie case of sex discrimination. See Peele, 288 F.3d at 331-32. Accordingly, Defendant is entitled to summary judgment. See Peele, 288 F.3d at 332.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiff's Motion to Strike Defendant's Reply (#21) is DENIED.

(2) Defendant's Motion for Summary Judgment (#16) is GRANTED. Judgment is entered

15

in favor of Defendant and against Plaintiff.

(3) This case is terminated. Accordingly, the final pretrial conference scheduled on May 25, 2006, and the jury trial scheduled on June 5, 2006, are hereby VACATED.

(4) The Motions in Limine (#26, #27) are therefore MOOT.

ENTERED this 25th day of May, 2006

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE